# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 2:18-cv-62-RSB-BWC |
| v. | ) |
| | ) |
| HERCULES LLC, | ) |
| | ) |
| Defendant. | ) |

## HERCULES LLC'S REPLY BRIEF IN SUPPORT OF THE UNITED STATES' UNOPPOSED MOTION TO ENTER CONSENT DECREE

Pursuant to Local Rule 7.6, Defendant Hercules LLC ("Hercules") respectfully submits this Reply Brief in Support of the United States' Unopposed Motion to Enter Consent Decree ("Unopposed Motion").[1]  Hercules files this Reply Brief to reiterate its support for moving forward with the work required under the proposed Consent Decree ("CD") and to raise several issues for the Court's consideration in light of the Brief of Amici Curiae City of Brunswick and Glynn County Opposing the Consent Decree ("Amici Brief").[2]

By way of background, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. ("CERCLA") §§ 9601 *et seq.*, Congress has given to the United States Environmental Protection Agency ("EPA") the authority to make administrative decisions regarding remedial actions to address releases of hazardous substances to the environment.  CERCLA requires EPA to give the opportunity for public input into its

---

[1] Doc. 25.  While the Amici now oppose entry of the Consent Decree, Hercules refers to the United States' Motion as the "Unopposed Motion," consistent with how it was styled when filed with the Court.

[2] Amici Brief, Doc. 34.

1

proposed decisions.  EPA met the requirements for public input regarding its proposed interim remedy prior to making its decision, and the Amici participated fully in this process.

The standard of review of a proposed Consent Decree was discussed fully in the Brief of the United States in support of its Motion for Entry of the Consent Decree and in Hercules' Brief in Support of that Motion.  The standard is restated below to provide necessary context for Hercules' response to the Amici's arguments.

### A.     The Consent Decree is Fair, Reasonable, Adequate and Consistent with CERCLA's Objectives.

In reviewing the CD, the Court must satisfy itself that the proposed settlement is reasonable, fair, and consistent with the statutory purposes of CERCLA.[3]  As discussed in detail in the United States' Unopposed Motion and in Hercules' Brief in Support ("Supporting Brief"), the proposed CD meets this standard:

- The CD requires Hercules to implement an interim remedy for a small part of the Terry Creek Dredge Spoil Areas/Hercules Outfall Site in Brunswick, Georgia (the "Site").  The interim remedy requires remediation of an outfall ditch referred to as "Operable Unit 1" ("OU1") of the Site.  The outfall ditch is located on property owned by Hercules.  EPA's selected interim remedy, when implemented, will eliminate potential exposure pathways to toxaphene-impacted sediment in the outfall ditch by rerouting surface water flows into a newly constructed, concrete lined conveyance structure, removing sediment from the existing ditch to facilitate construction of the new ditch, and backfilling the existing ditch with clean soil.[4]  This remedy will isolate

---

[3] *See, e.g.*, *City of Fort Lauderdale*, 81 F. Supp. 2d at 1350; *United States v. Bay Area Battery*, 895 F. Supp. 1524, 1528 (N.D. Fla. 1995) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir. 1990)); *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011); *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 876 (9th Cir. 2014).

[4] IROD, Doc. 3-3 at 11, 22, 61.

sediments in the existing ditch approximately 10 feet below the ground surface, prevent exposure to potential receptors, and prevent future migration of sediment from the ditch into the adjacent creek system.[5]

- The CD requires Hercules to conduct monitoring before, during, and after construction to ensure that the interim remedy is protective of human health and the environment.[6]  EPA conducts reviews of effectiveness every five years.  If the remedy is not effective, paragraph 62 of the CD expressly allows EPA to require additional remedial measures for the Site.[7]

- The CD requires Hercules to fully bear the cost of designing, constructing, and monitoring the interim remedy.  In addition to funding the work itself, Hercules must reimburse all of the United States' outstanding past response costs associated with the Site, and all of its future response costs to be incurred in connection with the CD.[8]

- The settlement itself also promotes the efficient use of government resources by obtaining the best-case litigation outcome for the United States while avoiding the costs and delay associated with protracted litigation.[9]

**B.    The Amici Brief Focuses Exclusively on EPA's Selected Remedy and Provides No Basis for Rejecting the Consent Decree.**

In their brief, the Amici ask the Court to reject the proposed CD, not because they object to any particular term or condition of the CD itself, but because they object to the interim remedy

---

[5] IROD, Doc. 3-3 at 39.

[6] CD, Doc. 3-1, ¶¶ 6.a, 15, 29, 30.

[7] CD, Doc. 3-1, ¶ 62.

[8] CD, Doc. 3-1, ¶¶ 29, 30.

[9] Doc. 25 at 10-11; Doc. 29 at 5.

that EPA has selected and with which the State of Georgia has concurred.[10]  These same objections were raised during the 75-day public comment period on the Proposed Plan for OU1, and again during the 120-day public comment period for the proposed CD.  Thus, contrary to the Amici's suggestion that these comments and concerns "have gone unanswered,"[11] EPA in fact carefully considered and responded to each of them twice now, including in the 78-page response-to-comment document attached as Exhibit 2 to the Unopposed Motion.[12]  The Amici simply disagree with EPA's decision, which was made in accordance with the authority given to it by Congress.

In connection with that delegation of authority, CERCLA specifically prohibits any challenges to an EPA-selected remedy until "after a remedial action is actually completed."[13]  In selecting the interim remedy for the outfall ditch, EPA evaluated the relative performance of 11 different potential remedial alternatives in relation to the nine evaluation criteria specified in the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").  In the Interim Record of Decision ("IROD") for OU1, EPA exercised the authority granted it by Congress when it made the statutory determination that the selected interim remedy "is protective of human health and the environment," and "provides the best balance of tradeoffs among the other alternatives with respect to pertinent criteria, given the limited scope of action."[14]  The Court must give deference

---

[10] *See*, *e.g.*, Amici Brief, Doc. 34 at 2 (arguing that the Court should reject the CD because it "proposes a remedy that is plainly inadequate"); IROD, Doc. 3-3 at 57 (referencing State of Georgia's concurrence); CD, Doc. 3-1, ¶ I (same).

[11] Amici Brief, Doc. 34 at 4.

[12] Doc. 25 at 17-32 & Ex. 2.

[13] 42 U.S.C. § 9613(h).  *See also Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072-74 (11th Cir. 2002); *Alabama v. EPA*, 871 F.2d 1548, 1557 (11th Cir. 1989).

[14] IROD, Doc. 3-3 at 11, 59.

to this determination, which was made in full compliance with CERCLA, the remedy selection process set forth in the NCP, and EPA guidance.[15]   Thus, while the Amici may disagree with EPA's evaluation and its ultimate remedy selection, neither they nor the Court may substitute their views for EPA's determination.

Finally, many of the Amici's concerns appear to be based on critical misconceptions concerning current and future risk at the Site, the potential impacts of EPA's selected interim remedy on future redevelopment opportunities at the Site, and Hercules' commitment to making progress at the Site.  These include:

1.      *The suggestion that during the pendency of the proposed CD, new information was developed indicating that "weathered toxaphene is many orders of magnitude more toxic than the 'technical toxaphene' . . . ."*[16]  This and other statements to this effect in the Amici Brief are incorrect.  They appear to rely on a misstatement by Dr. Peter deFur, the former technical advisor to the Glynn Environmental Coalition ("GEC"), with respect to his misinterpretation of EPA's National Center for Environmental Assessment ("NCEA") Provisional Peer-Review Toxicity Values for Technical Toxaphene CASRN 8001-35-2, Weathered Toxaphene, and Toxaphene Congeners, dated July 31, 2018 ("NCEA Study").  As EPA explained in its August 1, 2019 response-to-comment document relating to the proposed CD, and as the United States noted again in its Response to the City of Brunswick and Glynn County's Motion for Leave, GEC publicly retracted and corrected Dr. deFur's misstatement in June 2019 and recognized that the NCEA Study had actually concluded that the "lack of studies on weathered toxaphene

---

[15] *City of Fort Lauderdale*, 81 F. Supp. 2d at 1350–51 (citing *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1425 (6th Cir. 1991)); *Coeur d'Alenes Co.*, 767 F.3d at 876, 879.

[16] Amici Brief, Doc. 34 at 2.

5

prevented EPA from estimating with any confidence its toxicity relative to technical toxaphene."[17]

      2.     *The suggestion that only "the complete removal of contamination in OU1" is the necessary remedy.*  Amici make several statements that the remedy is not adequate based upon the assumption that the only acceptable remedy is to remove all contamination.[18]  This is wrong. Remedial decisions are based upon a Remedial Investigation and Feasibility Study ("RI/FS"), which has at its core a risk assessment.  Proposed remedies must reduce risk to levels established by EPA in accordance with the NCP.  Further, Congress explicitly directed EPA to consider a variety of factors during remedy selection.  42 U.S.C. § 9621(b)(1).  The selected remedy meets these criteria, and its approach is similar to that of many remedies used in Georgia and throughout the United States.

      3.     *The suggestion that public input can act as a veto of an otherwise proper remedial decision.*  Amici argue that because certain members of the public prefer removal of contamination over the selected remedy, it should be rejected by this Court.  While Congress gave the public the opportunity for input (which the Amici admit they took), it did not give the decision-making authority to the public.  It is noteworthy that the comments did not point out any lapse in process or deviation from standards set by EPA in making its decision.  The comments were instead mostly carbon copy objections to the proposed remedy, demanding that all contamination be removed.  Likewise, the Amici's remarks in their Brief about flooding and storms are simply an indication that they disagree with how EPA exercised its authority, and do not support the argument that EPA acted outside of its authority.

---

[17] Doc. 32; GEC, "EPA Releases Peer-Reviewed Toxaphene Toxicity Assessment" (June 2019), at https://docs.wixstatic.com/ugd/af34e1_1ad39e853f2c4fc2be78386ca47abe5f.pdf (last accessed on Oct. 21, 2019).

[18] *See, e.g.*, Amici Brief, Doc. 34 at 9-10.

4.      *The suggestions that "fish species in the area have become so contaminated with toxaphene that they are dangerous to eat" and that "surveys continue to show unacceptable levels of toxaphene in fish."[19]*  Toxaphene concentrations in fish tissue continue to show a downward trend both over time and in distance from the outfall ditch.  In October 2018, the Georgia Department of Natural Resources released updated fish tissue guidelines that incorporated the most recent fish tissue results from Terry Creek collected in October 2017.[20] These guidelines reflect that while three species have weekly or monthly guidelines for consumption, there are no longer any species listed as "Do Not Eat."  Once the interim remedy for the outfall ditch is implemented, fish tissue concentrations are expected to decline further.[21]

5.      *The suggestion that redevelopment will be hindered.[22]*  Implementation of EPA's selected interim remedy full preserves the ability to redevelop Hercules' property for other uses in the future.  Redeveloping and repurposing "Brownfields" properties is done throughout the country, including at former industrial properties where capping remedies are used to eliminate potential exposure pathways.  Further, expediting the reduction of potential risks to human health and the environment through implementation of EPA's selected interim remedy will promote, not hinder, the cleanup and revitalization of the Site.  On the other hand, if the proposed CD is not approved and EPA's selected interim remedy is therefore not implemented, the status quo will be maintained for years to come – a result that would be contrary to the very interests that the Amici seek to promote and protect.  Finally, OU1 is not on public property; it is on land

---

[19] Amici Brief, Doc. 34 at 4, 5.

[20] *See* George Department of Natural Resources, "Guidelines for Eating Fish from George Waters" (2018), at https://epd.georgia.gov/document/publication/fcg2018102618printeab-reviewpdf/download.

[21] IROD, Doc. 3-3 at 11.

[22] Amici Brief, Doc. 34 at 8-9.

owned by Hercules.  As owner of the property that has been designated as OU1, Hercules has the greatest interest in maintaining its value.  Hercules is open to reasonable approaches to redevelopment, consistent with the historical use of the property and the nature of the past and current uses in neighboring properties.  As noted previously, however, such efforts will be unavailing until Hercules has been permitted to implement the interim remedy.

6.      *The suggestion that Hercules has a long history of delaying cleanup at the Site.*[23] Hercules has been actively working under EPA direction and oversight at the Site since 1998, when the company entered into an Administrative Order on Consent ("AOC") with EPA to remove contaminated sediment from OU1 and the adjacent creek system.[24]  During 1999 and 2000, Hercules removed approximately 35,000 cubic yards of contaminated sediment from the Outfall Ditch and portions of Terry and Dupree Creeks, achieving an estimated 82.5% reduction in toxaphene mass from the environment.[25]  While this removal work was ongoing, Hercules also entered into a separate AOC with EPA to perform a RI/FS for the Site.[26]  Hercules prepared and submitted an RI/FS Work Plan to EPA in 2001, but shortly thereafter, EPA temporarily suspended work due to questions concerning the analytical method for toxaphene and weathered toxaphene in the environment.[27]

In an effort to move the project forward, Hercules and EPA subsequently agreed to develop and pursue a staged approach for addressing contamination at the Site, prioritizing the

---

[23] Amici Brief, Doc. 34 at 13.

[24] IROD, Doc. 3-3 at 16.

[25] IROD, Doc. 3-3 at 38.

[26] IROD, Doc. 3-3 at 16.

[27] IROD, Doc. 3-3 at 325.

outfall ditch (OU1) for investigation and remediation.  The outfall ditch was selected first due to its manageable size, the relatively higher concentrations of toxaphene in the outfall ditch as compared to other areas of the Site, and the potential to develop a remedy that would not be dependent upon resolution of the complex scientific questions concerning toxaphene and how it behaves in the environment.  Hercules completed and submitted to EPA a Focused RI/FS for the outfall ditch in 2014.[28]  After providing an extensive 75-day public comment period, and taking time to draft responses to each of the comments received, in June 2017, EPA issued the IROD and selected the interim remedy that is now embodied in the Consent Decree before the Court.

      **C.**    **<u>Conclusion</u>**

Hercules shares the Amici's desire to implement a remedy for the outfall ditch that is fully protective of human health and the environment, and respectfully requests that the Court enter the proposed CD so that Hercules can move forward with the remedy that EPA has selected to accomplish this end.  The proposed CD is fair, reasonable, adequate, and consistent with CERCLA's objectives, and is the first step in ensuring the prompt and effective cleanup of the Site.

Respectfully Submitted,

Dated: October 21, 2019

*/s/ Mark D. Johnson*
Mark D. Johnson
GILBERT, HARRELL, SUMERFORD &
MARTIN, PC
P.O. Box 190
Brunswick, GA 31521-0190
Phone: 912-265-6700
Fax: 912-264-3917
Email: mjohnson@gilbertharrelllaw.com
*Attorney for Defendant, Hercules LLC*

---

[28] IROD, Doc. 3-3 at 20.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing **HERCULES LLC'S REPLY BRIEF IN SUPPORT OF THE UNITED STATES' UNOPPOSED MOTION TO ENTER CONSENT DECREE** has been served up all counsel of record through the Court's Electronic Case Filing System, this 21st day October, 2019.

/s/ Mark D. Johnson
Mark D. Johnson