# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

HERCULES, LLC,

        Defendant.

CIVIL ACTION NO.: 2:18-cv-62

## O R D E R

This matter comes before the Court on Plaintiff's Unopposed Motion for Consent Decree. (Doc. 25.) Through this motion, the parties seek to resolve all claims in the Complaint, (doc. 1), alleging liability under Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607. This lawsuit and the parties' proposed resolution pertain to a two and one-half acre piece of land owned by Defendant Hercules, LLC ("Hercules") and referred to by the parties as "Operable Unit 1." Operable Unit 1 lies within a larger site known as Terry Creek Dredge Spoil Area/Hercules Outfall Site ("the Site"). The Site, including Operable Unit 1, is contaminated with the hazardous substance toxaphene due to Hercules' prior operation of a chemical plant in the area. The United States filed this lawsuit seeking to hold Hercules responsible for performing an interim remedial action selected by the United States Environmental Protection Agency ("the EPA") for Operable Unit 1. The United States and Hercules have reached an agreement whereby Hercules will be required to design and perform that remedial action and reimburse the United States for both its outstanding past response costs as to Operable Unit 1 and all future response costs in connection

with the remediation. This agreement is embodied in the proposed Consent Decree submitted by the parties.

The record contains voluminous public comments submitted in response to both the remedial action plan and the Consent Decree. These comments are overwhelmingly critical of the EPA's selected remedial action plan. However, the EPA thoroughly considered these public comments in developing the plan and in moving for entry of the Consent Decree. In developing the remedy, the EPA conducted a multifactorial analysis that involved numerous technical judgments. The EPA determined that the selected interim remedial action was an effective means for protecting human health and the environment. The agency specifically concluded that the interim action was a superior remedy when compared to the other alternatives considered, including those preferred by the public commenters.

As explained more fully below, CERCLA and the precedent surrounding the Act limit the role the Court must play in reviewing the Consent Decree. It would be improper for the Court to review the EPA's selection *de novo* or for the Court to substitute its judgment for the judgment of the EPA on these technical decisions. The Court cannot modify the Consent Decree or craft a better plan. Further, the Court's inquiry is not whether the selected remedy is the best plan or the plan that the Court itself would have selected. Rather, the Court's only decision is whether to accept or reject the Consent Decree. In making that decision, the law requires the Court to give substantial deference to the EPA's judgments and selected remedial action plan as well as the parties' proposed resolution. The Court can only reject the decree if it is unlawful, unreasonable, or inequitable.

Further, the Court must be cognizant of the practical realities of this case. The Court cannot award any direct relief in this lawsuit (by the parties' consent or otherwise) beyond that requested

by the United States in its Complaint. Through the proposed Consent Decree, the United States obtains from Hercules the entirety of that requested relief without the need for protracted, costly, and uncertain litigation. In other words, the Consent Decree represents the "best result" the United States could receive in this litigation. Further, as explained below, if the Court were to reject the Consent Decree, there is no certainty that the EPA would eventually propose a remedial action different from that proposed in the Consent Decree, much less any certainty that Hercules would be required to perform that action. The only certainty that would come with a rejection of the Consent Decree would be that the cleanup efforts at Operable Unit 1 (and likely the entire Site) would remain mired in bureaucratic and litigation-based delays for years to come.

Having reviewed the Consent Decree cognizant of these practical considerations and through the lens of the substantial deference that must be applied, the Court **GRANTS** the United States' Motion. The Court will enter the Consent Decree contemporaneously with this Order. The Court **DIRECTS** the Clerk of Court to **CLOSE** this case.

## BACKGROUND

The beauty of coastal Georgia's landscape has inspired poets to put pen to paper and artists to put oil on canvas. However, many of the area's marshes, shores, and waters have not only been the subject of artistic adoration, but also the subject of invidious industrial pollution. This action revolves around such a piece of land. East of the City of Brunswick in Glynn County, Georgia, near the confluence of Terry Creek, Dupree Creek, and the Back River lies a two and one-half acre piece of land that the parties refer to as "Operable Unit 1 ('OU1') of the Terry Creek Dredge Spoil Areas/Hercules Outfall Site (the 'Site')." (Doc. 1, p. 1.)

The entire Site covers approximately 216 acres. (Doc. 25, p. 3.) In addressing remediation needs, the EPA divided the Site into three "operable units" including OU1, the subject of this

lawsuit. (Id.) "Operable Unit Two (OU2) consists of several areas including portions of the former Hercules facility east of Highway 17 known as the Marsh Wood Storage Yard, which is approximately 25 acres, the Main Dredge Spoil Area, which is approximately 72 acres, the Riverside Dredge Spoil Area, which is approximately 48 acres, and Carter's Island, which is about 3.5 acres. Operable Unit Three (OU3) includes approximately 65 acres of Terry Creek and Dupree Creek." (Id. at pp. 3–4 (citation omitted).) The record's best depictions of the Site, particularly OU1, are contained in the following figures attached to the Consent Decree at doc. 3-2, pp. 3–4:





**Terry Creek Site**
**Operable Units**
Brunswick, Georgia

| Geosyntec ▷ consultants Atlanta, Georgia | ▤HERCULES | Figure 3 |

Operable Unit 1 likely deserves a more artful moniker and certainly a better fate than the pollution that has sullied it for decades. Defendant Hercules owns Operable Unit 1 and used it while operating a chemical plant in the area from 1948 to 1980. (<u>Id.</u> at pp. 2–3.) Hercules manufactured the pesticide toxaphene[1] at the plant and discharged wastewater containing toxaphene through an outfall ditch until at least 1972. (<u>Id.</u>; doc. 3-3, p. 16.) The outfall ditch lies

---

[1] "As manufactured, the original toxaphene pesticide is a mixture of more than 200 closely related chlorinated organic compounds." (Doc. 3-3, p. 12.) This original toxaphene mixture is commonly called "technical toxaphene." (<u>Id.</u>) "When the original toxaphene is released to the environment, it naturally breaks down or degrades. These breakdown products are a different mixture than the original toxaphene mixture, so it appears different to the testing instruments. EPA may refer to this as degraded toxaphene, weathered toxaphene, or breakdown products." (<u>Id.</u>) "Toxaphene was one of the most heavily used insecticides in the United States until 1982, when EPA cancelled the registrations for most uses; all uses were banned in 1990." (<u>Id.</u> at p. 145.)

within Operable Unit 1 and empties into Dupree Creek which in turn flows into Terry Creek. (Doc. 1, p. 3.) The EPA has determined that the Site, including Operable Unit 1, is contaminated with toxaphene, a hazardous substance within the meaning of CERCLA. (Id.)

Hercules and the EPA took action to address this contamination between August of 1999 and April of 2000. (Doc. 3-3, pp. 17–18; doc. 25, p. 4.) During those months, with the EPA's oversight, Hercules dredged and removed "approximately 16,800 cubic yards of contaminated sediment from the Outfall ditch (approximately 80%–90% of the contaminant mass for technical toxaphene from the Outfall Ditch) and another approximately 18,200 cubic yards of contaminated sediment from Dupre Creek and Terry Creek." (Doc. 25, p. 4 (footnote omitted).) This excavation removed "the principal threat wastes contained in sediment in Operable Unit 1 pertaining to technical toxaphene." (Id. at n.5.) However, it appears that since April of 2000, no other remedial action has been conducted within Operable Unit 1.[2]

Between 2012 and 2014, in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300, and pursuant to an agreement with the EPA, Hercules conducted a Focused Remedial Investigation and Feasibility Study ("Focused RI/FS") for Operable Unit 1. (Doc. 25, pp. 4–5; doc. 3-3, p. 20.) "The approach for OU1 was to develop remedial action objectives and cleanup goals for OU1 as a narrative performance-based goals (i.e., protectiveness achieved via pathway elimination) rather than numerical risk-based concentrations for toxaphene since an EPA toxicity value for weathered toxaphene does not presently exist." (Doc. 3-3, p. 22.) Hercules submitted the final OU1 Focused RI/FS report to the EPA in December 2014. (Id.) On June 26, 2015, the EPA published notice of the documents pertaining to the Site as well as the completed report and proposed plan for remedial action in the

---

[2] During that time, the Site has been investigated and monitored. (See generally Doc. 3-3, pp. 17–18, 22.)

local newspaper, The Brunswick News, and afforded time for the public to submit written and oral comments.  (Id. at p. 122.)  A public meeting on the plan was held on July 30, 2015, and on December 8, 2015, representatives from the EPA and the Environmental Protection Division met with local officials and held a public availability session.  (Id.)

On June 19, 2017, the EPA issued an Interim Record of Decision ("IROD") for Operable Unit 1.  (Doc. 1, p. 3; doc. 3-3.)  The IROD is comprehensive and contains a large amount of historical and technical information that need not be recounted herein.  (Doc. 3-3.)  However, within the IROD, the EPA listed "the primary components of the selected interim remedy" as follows:

- Re-routing the existing stormwater ditch into a newly constructed concrete-lined ditch.
- Excavation and offsite disposal of impacted sediment near Glynn Avenue to construct the new ditch.
- Removal of the existing weir across the Outfall Ditch.
- Placement of geo-textile fabric over existing sediment in the Outfall Ditch.
- Backfilling the Outfall Ditch with compacted clean soil over the fabric.
- Armoring the backfill slope at the confluence with Dupree Creek.
- Seeding and stabilization of disturbed areas.
- Periodic inspections, maintenance, and sediment removal in the newly constructed ditch.
- Development and implementation of a long term monitoring plan to ensure the effectiveness of the interim remedy.
- Implementation of institutional controls such as an environmental covenant prescribing land use and activity restrictions to prevent unauthorized disturbance of the soil cover and other interim remedy components.

(Id. at p. 11.)  This remedial action within the IROD is the remedy that the United States seeks to have Hercules to perform by filing this lawsuit, and that remedy is encompassed in the Consent Decree.

In addition to explaining the reasons for choosing the selected remedy and the specifics of that remedy, the IROD discussed several other alternative remedies that the EPA considered but ultimately rejected.  (Id. at pp. 38–53.)  The IROD also included numerous attachments containing

information surrounding the EPA's decision, including a thorough record of public comments and the EPA's responses thereto as well as a transcript of the July 30, 2015 public meeting. (Id. at pp. 124–482.)[3] The State of Georgia concurred with the remedy proposed in the IROD. (Id. at p. 57.)

On May 16, 2018, the United States filed this lawsuit seeking to hold Hercules liable for the implementation and costs of the plan set forth in the IROD. (Doc. 1.) Additionally, the United States requested a judgment against Defendant for the response costs incurred to date as well as a declaratory judgment that Defendant is liable for further response costs. (Id. at p. 7.) At the time of filing the Complaint, the United States also lodged the proposed Consent Decree. (Doc. 3.) Under the Consent Decree, Hercules must: create the final plans and specifications for the remedy outlined in the IROD; construct, maintain, and monitor the remedy; support community involvement activities; reimburse the United States for past response costs of $153,009.48; and reimburse the United States for all costs it incurs in connection with the work. (Docs. 3-1, pp. 3–4, 33.) In return, the United States will provide Hercules with a covenant not to sue as to the work at Operable Unit 1 as well as protection against third party claims for contribution. (Id. at pp. 52–54.) The covenant not to sue specifies that it does not pertain to the other operable units or to any final response for Operable Unit 1. (Id.)

The United States provided an initial thirty-day period for public comment to the Consent Decree and then provided two extensions resulting in a total 120-day public comment period. (Doc. 25, pp. 6–7.) At the conclusion of that period, on August 1, 2019, the United States filed the instant Unopposed Motion to Enter Consent Decree. (Id.) The United States attached to the Motion a bevy of public comments, (doc. 25-1), as well as EPA's responses to those comments,

---

[3] The comments came from four environmental organizations, four local government units or agencies (including the City of Brunswick and Glynn County), one individual, and Defendant Hercules. (Id.at p. 122–23.)

(doc. 25-2).  The United States also provided affidavits from Timothy A. Frederick, an EPA human health risk assessor, (doc. 25-3), and Dr. Brett Thomas, an EPA ecological risk assessor, (doc. 25-4), in support of the Consent Decree.  Defendant Hercules has filed two briefs in support of the Motion to Enter the Consent Decree, (docs. 29, 35), and the City of Brunswick and Glynn County filed an amici curiae brief opposing entry of the decree, (doc. 34).

## DISCUSSION

## I.    CERCLA OVERVIEW

The United States Court of Appeals for the Sixth Circuit provided the following apt description CERCLA's background and the avenues the Act provides the EPA to address the nation's hazardous waste sites:

> By the late 1970s, Congress concluded that existing cleanup programs were inadequate to the task of taking care of literally thousands of sites across the country posing a serious threat to public health and the environment.  Consequently, in 1980, Congress enacted CERCLA, also known as 'Superfund,' to ensure prompt and efficient cleanup of hazardous waste sites and to place the costs of those cleanups on the [potentially responsible parties ('PRPs')].  See S. Rep. No. 848, 96th Cong., 2d Sess. 98, reprinted in, 1 Cong. Research Serv., 97th Cong., 2d Sess., *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund)*, at 405 (1980).

> Throughout the 1980s, the Superfund hazardous waste cleanup program enjoyed centerstage prominence in environmental law.  Nevertheless, the early years of CERCLA were difficult.  CERCLA was a hastily-assembled bill which contained a number of technical flaws due to Congress' limited understanding of the hazardous waste problem and its effects on the environment.  See Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ('Superfund') Act of 1980*, 8 Colum. J. Envtl. L. 1, 2, 34 (1982).  Both Congress and EPA, for example, believed in the late 1970s that a site could be adequately cleaned up by 'scraping a few inches of soil off the ground.'  H.R. Rep. No. 253, 99th Cong., 2d Sess., pt. 1, at 54 (1986), reprinted in 1986 U.S. Code Cong. & Admin. News 2835, 2836.  Congress also grossly underestimated the number of sites requiring cleanup and the monies necessary to remedy the problem.  Compare id. with H.R. Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 18–20 (1980), reprinted in 1980 U.S. Code Cong. & Admin. News 6119, 6120–23. EPA, as the delegatee of the President's authority under CERCLA, 42 U.S.C. § 9615, was criticized for the slow pace of cleanups, for failing to provide remedies that would

protect public health and the environment, and for alleged 'sweetheart' deals that reduced cleanup costs for industry at public expense. As a result, in 1986 Congress passed SARA, which reauthorized and amended CERCLA in several important ways. Congress sought to better define cleanup standards, to expand resources available to EPA for investigations and cleanups, to clarify EPA's authority under Superfund law, and to expand and clarify the states' role in any remedial action undertaken, or ordered, by EPA.

CERCLA applies 'primarily to the cleanup of leaking inactive or abandoned sites and to emergency responses to spills.' F. Anderson, D. Mandelker & A. Tarlock, *Environmental Protection Law and Policy* 568 (1984). . . . Once EPA determines under CERCLA that a response action is needed at a particular hazardous waste site, it must publish a proposed remedial action plan ('RAP') and provide an opportunity for comment. 42 U.S.C. § 9617. EPA then issues a Record of Decision ('ROD') setting forth the remedy selected for the site, including remedial technologies and cleanup standards. 42 U.S.C. § 9617.

In implementing its RAP, EPA may pursue one of three possible courses of action. See generally Koppers Indus., Inc. v. EPA, 902 F. 2d 756, 757 n.1 (9th Cir. 1990) (discussing the various options). EPA may undertake a response measure on its own, which may include removal and/or remedial action, and then sue PRPs it can find for reimbursement. 42 U.S.C. §§ 9604, 9607. In the interim, or in the event it cannot locate any PRPs or they cannot be made to pay the cleanup costs, the government-initiated cleanup may be financed by the 'Superfund,' 42 U.S.C. § 9611, a trust fund derived from general federal revenues and an excise tax on specified chemicals. See 42 U.S.C. § 9631. Secondly, EPA may, independent of fund-financed response actions, issue an administrative order directing PRPs to implement removal or remedial action. 42 U.S.C. § 9606. Alternatively, EPA may apply to the district court for an injunction to compel PRPs to clean up or abate an actual or threatened release of hazardous substances from a facility. Id. As a third option, EPA may enter into an agreement with PRPs to perform a response action, 42 U.S.C. § 9622. Such an agreement is at issue here.

United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1416–18 (6th Cir. 1991). When the EPA chooses the "third option" and reaches an agreement with a potentially responsible party ("PRP") to perform a response action, the "agreement shall be entered in the appropriate United States district court as a consent decree." 42 U.S.C. § 9622(d)(1)(A).

When reviewing a consent decree, the Court must be mindful that CERCLA encourages settlements. See In re Tutu Water Wells CERCLA Litig., 326 F.3d 201, 206 (3d Cir. 2003) ("Notable for our purposes here is that [CERCLA] expressly provides that '[w]henever practicable

and in the public interest . . . [the government] shall act to facilitate agreements . . . in order to expedite effective remedial actions and minimize litigation.'") (quoting 42 U.S.C. § 9622(a)); United States v. Vertac Chem. Corp., 756 F. Supp. 1215, 1218 (E.D. Ark. 1991) ("Furthermore, the public policy favoring settlement is reflected in the governing statute, CERCLA."). Even outside of the CERCLA context, this Court has recognized that "cooperation and voluntary compliance are the preferred means of achieving the goals of environmental legislation." Jones Creek Inv'rs, LLC v. Columbia County., Ga., No. CV 111-174, 2013 WL 164516, at *2 (S.D. Ga. Jan. 15, 2013) (approving Clean Water Act consent decree) (citing United States v. City of Miami, Fla., 664 F.2d 435, 441 (5th Cir. 1981)). This preference for an agreed-upon resolution is particularly strong where the agreement results from arm's length negotiations between the parties. See United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990) ("Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table. That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance.") (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988)).

The deference afforded a CERCLA consent decree is heightened when the EPA, the agency dedicated to carrying out the objectives of CERCLA, is a party to the decree as is the case here. See United States v. Bay Area Battery, 895 F. Supp. 1524, 1528 (N.D. Fla. 1995) ("When, as in this case, an agency committed to furthering the public interest has negotiated a decree, there is a presumption of validity."). Given the authority that Congress has vested in the EPA and the

agency's considerable expertise in the cleanup of hazardous waste sites, the Court must not second guess the reasoned judgment of the EPA.

> Ours should not be the task of engaging in a *de novo* review of the scientific evidence pro and con on each proposed remedy in the hazardous substance arena. The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegatee, the EPA administrator and his staff. 'When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.'

Akzo Coatings of Am., Inc., 949 F.2d at 1424 (quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)); see also Cannons Eng'g Corp., 899 F.2d at 94 ("A district court, faced with consent decrees executed in good faith and at arm's length between the EPA and counselled polluters, must look at the big picture, leaving interstitial details largely to the agency's informed judgment."); United States v. City of Fort Lauderdale, 81 F. Supp. 2d 1348, 1350–51 (S.D. Fla. 1999) ("[T]his Court may not substitute its judgment for that of the expertise of EPA officials in choosing a clean-up remedy.").

Thus, when reviewing a consent decree, the Court's inquiry "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal." Cannons Eng'g Corp., 899 F.2d at 84; see also Akzo Coatings of Am., Inc., 949 F.2d at 1436 ("In evaluating the decree, it is not our function to determine whether this is the best possible settlement that could have been obtained . . . ."); Bay Area Battery, 895 F. Supp. at 1528 ("It is not the Court's place to determine whether the decree represents an optimal settlement in the Court's view."). Rather, "the Court's role is limited at this juncture to determining whether the terms of the consent decree 'are not unlawful, unreasonable, or inequitable.'" City of Fort Lauderdale, 81 F. Supp. 2d at 1350 (quoting United States v. City of Jackson, 519 F.2d 1147, 1151 (5th Cir. 1975)); see also Jones Creek Inv'rs, LLC, 2013 WL 164516, at *2 ("The Court must ensure that the parties' proposed Consent Decree

is not 'unlawful, unreasonable, or inequitable.'") (quoting United States v. Hialeah, 140 F.3d 968, 973 (11th Cir. 1998)).

In the CERCLA context, this inquiry is often expressed as ensuring that "the settlement is reasonable, fair and consistent with the purposes that CERCLA is intended to serve." Akzo Coatings of Am., Inc., 949 F.2d at 1424; see also Cannons Eng'g Corp., 899 F.2d at 84 (assessing whether CERLA consent decree "is fair, reasonable, and faithful to the objectives of the governing statute"); Bay Area Battery, 895 F. Supp. at 1528 ("[T]he Court must determine whether the proposed decree satisfies the requirements of being reasonable, fair and consistent with CERCLA's goals."). "While the district court should not mechanistically rubberstamp the agency's suggestions, neither should it approach the merits of the contemplated settlement *de novo*." Cannons Eng'g Corp., 899 F.2d at 84. Moreover, the Court "cannot tinker with the consent decree, and must either accept or reject the terms." City of Fort Lauderdale, 81 F. Supp. 2d at 1350.

## II.   ANALYSIS OF THE PARTIES' PROPOSED CONSENT DECREE

Turning to the parties' proposed Consent Decree in this case, the Court has reviewed the entirety of the record before it, including amici curiae's brief as well as the public comments lodged in opposition to the decree and the EPA's responses thereto. The Court does not question the sincerity of those who have opposed the decree.[4] However, as laid out above, the Court's

---

[4] As the United States correctly points out, members of the public do not have legal standing to challenge the proposed consent decree, as "42 U.S.C. § 9613(h)[] provides that courts may review citizen challenges to a remedial action 'only after a remedial action is actually completed.'" (Doc. 32, p. 2 (quoting City of Fort Lauderdale, 81 F. Supp. 2d at 1350 (quoting State of Ala. v. U.S. E.P.A., 871 F.2d 1548, 1557 (11th Cir. 1989), cert. denied, 493 U.S. 991 (1989))). Nonetheless, the Court has reviewed the issues raised by the public comments and reiterated in the amici curiae brief and has considered them in reviewing the Consent Decree. See City of Fort Lauderdale, 81 F. Supp. 2d at 1350 ("Although this Court cannot find that the non-parties have standing in this case, the matters raised by the non-parties in their filings and at the hearing held by this Court are significant and require this Court's close and careful scrutiny."). The Court has studied all the public comments and is satisfied that the EPA has adequately responded to them.

inquiry at this stage is not whether the parties' proposal is perfect or even the preferred resolution. Rather, the Court must limit its assessment to whether the Consent Decree is fair, reasonable, and consistent with the purposes of CERCLA. For the reasons summarized below, the Court finds that the Consent Decree satisfies those criteria.

## A. Fairness

Courts reviewing CERCLA consent decrees typically divide the fairness inquiry into two parts: procedural fairness and substantive fairness, see Bay Area Battery, 895 F. Supp. at 1528 (citing Cannons Engineering, 899 F.2d at 86), and the Court will follow that same approach in assessing the parties' proposed Consent Decree.

### 1) Procedural Fairness

When assessing procedural fairness, "courts should review the bargaining process and measure its candor, openness, and the bargaining balance between the parties." Id. Here, it appears from the record that the Consent Decree resulted from an arm's length and transparent negotiating process between the United States and Hercules. Throughout the process, information leading to the Consent Decree, including the results of the studies of Operable Unit 1, were made available to the public. Moreover, the procedure leading to the IROD and the Consent Decree included an investigation into alternative remedies, open meetings with the public, and opportunities for public comment in accordance with pertinent regulations. Consequently, the Consent Decree bears the typical hallmarks of procedural fairness. See Jones Creek Inv'rs, LLC, 2013 WL 164516, at *2 ("[T]he Court has been presented no evidence that the consenting parties had anything other than an arm's length, good-faith, settlement negotiation.").

---

However, because many of the comments pertain to "interstitial details" that the Court need not delve deeply into, the Court only addresses the primary concerns in this Order. Additionally, while the Court has reviewed the public comments, it chiefly cites to amici curiae's brief as it reflects the primary concerns raised in the comments.

However, several commenters and the amici curiae object to the the procedure leading to the Consent Decree based on developments following the issuance of the IROD. Specifically, they point out that "[o]n July 31, 2018, EPA's National Center for Environmental Assessment ('NCEA') released the 'Provisional Peer-Review Toxicity Values for Technical Toxaphne CASRN 8001-35-2, Weathered Toxaphene, and Toxaphene Cogeners."[5] (Doc. 34, pp. 14–15.) The commenters and amici curiae explain that the EPA and Hercules originally pursued an interim remedy (as opposed to a final remedy) due to the lack of information regarding the toxicity of the breakdown products of toxaphene, often referred to as weathered toxapehne. (Id. at p. 14.) They contend that the publication of the PPRT Report invalidates this basis for developing an interim remedy rather than a final remedy for OU1. (Id. at p. 15 ("In other words, there is no longer any need for an interim remedy, and Alternative 4 and thus the Consent Decree have become outdated and obsolete.").)[6]

However, the EPA considered the PPRTV Report prior to proposing the Consent Decree, allowed additional time for public comment due to the publication of the study, and ultimately

---

[5] The parties refer to this report as "the PPRTV Report," and the Court will follow suit.

[6] As part of this argument, amici curiae contend that the PPRTV Report demonstrates that "weathered toxaphene is many orders of magnitude more toxic than the 'technical toxaphene' that was the sole consideration when the proposed remedy was identified[.]" (Doc. 34, p. 2.) In support of this contention, amici cite the comments of Dr. Peter DeFur that the "the report concludes that 'weathered toxaphene' is considered 300 times more toxic than 'technical toxaphene.'" (Id. at n.1.) Dr. DeFur was the prior technical advisor for Glynn Environmental Coalition. However, in his affidavit, Mr. Frederick, the EPA's human health risk assessor, explains that Dr. DeFur's extrapolation from the report was erroneous. (Doc. 25-3, pp. 6–9.) Mr. Fredrick states that "the PPRTV Report does not state this, and the misstatement appears to be a misunderstanding in how the noncancer toxicity values (reference doses) calculations are presented in the Report." (Id. at p. 6.) Mr. Frederick then presents a compelling technical explanation for this critique. (Id. at pp. 6–9.) Indeed, it appears that Glynn Environmental Coalition recognizes Dr. DeFur's misstatement; in June of 2019, its subsequent technical advisor published a corrected statement and explained, "[t]he toxicity assessment [PPRTV Report] found, however, that the lack of studies on weathered toxaphene prevented EPA from estimating with any confidence its toxicity relative to technical toxaphene." (See Doc. 32, pp. 4–5 (quoting GEC's June 2019 Technical Assistance Report entitled "EPA Releases Peer-Reviewed Toxaphene Toxicity Assessment").) It is unfortunate that amici curiae would include Dr. DeFur's now corrected misstatement in its brief.

found that the study did not warrant abandoning the interim remedy developed in the IROD and proposed in the Consent Decree. (Doc. 25-2, pp. 33–38.) The EPA explained in its response to the public comments on this issue that "this new information still contains uncertainties related to the ecological toxicity of weathered toxaphene, which prevents the full delineation and characterization of sediments in the Outfall Ditch." (Id. at p. 33.) The EPA also maintains that "[t]he PPRTV Report indicates that there is insufficient scientific data to develop human health noncancer and cancer toxicity values for toxaphene congeners (individual chemicals that make up the chemical mixture) and cancer toxicity values for weathered toxaphene." (Id. at p. 37.) Ultimately, the EPA determined that "[e]cological and human health risk based numeric cleanup goals for weathered toxaphene still cannot be developed." (Id. at p. 37.) In light of this conclusion, "the EPA selected an interim remedy, because it provides significant risk reduction without having to resolve the scientific issues (e.g., analytical method and toxicity) associated with the development of a numeric cleanup level for weathered toxaphene." (Id. at pp. 37–38.)

In support of its decision to continue with the interim remedy after publication of the PPRTV Report, the EPA offers the affidavits of Mr. Frederick and Dr. Thomas. (Docs. 25-3, 25-4.) Mr. Frederick, the human health risk assessor, details the PPRTV Report's content and its limitations. He concludes, among other things, that the report "does not impact the data evaluation portion of the risk assessment," "has no impact on the evaluation of exposure routes for OU1," "does not change the findings of the exposure assessment," "does not change the human health risk assessment conclusions for OU1," and, ultimately, that "the availability of PPRTVs for noncancer technical and weathered toxaphene does not change the characterization of human health risk in OU1." (Doc. 25-3, pp. 4–5, 10.) Dr. Thomas, the ecological risk assessor, explained that while the PPRTV Report provided information on human health toxicity from weather and

technical toxaphene, it provided no information on the ecological toxicity of weathered toxaphene and, therefore, "there still is no information on the ecological toxicity of weathered toxaphene." (Doc. 25-4, p. 3.)

When reviewing a consent decree, it is not the Court's role to second guess technical judgments made by scientists like Mr. Frederick and Dr. Thomas. Nor is it the Court's role to gauge who ultimately has the better argument as to whether the PPRTV Report should warrant scrapping the IROD and starting the remedial process anew. Rather, the Court must assess whether the decision to move forward with the interim remedy after the release of the PPRTV Report so taints the procedure by which the Consent Decree was reached as to render the decree procedurally unfair. Considering the entire record before the Court, including not only the PPRTV Report but also the EPA's responses and explanations, the Court finds that the Consent Decree passes the review of procedural fairness.

### 2) Substantive Fairness

"Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." Cannons Eng'g Corp., 899 F.2d at 87. Typically, the substantive fairness inquiry focuses on whether a settling defendant is apportioned its fair share of the costs of clean up relative to other non-settling PRP's. See, e.g., Bay Area Battery, 895 F. Supp. at 1529 (finding decree based on defendant's ability to pay substantively fair and noting that "[g]enerally, settlements in CERCLA cases should be based upon 'some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done.'") (quoting Cannons Eng'g Corp., 899 F.2d at 87).

Here, Hercules is the sole defendant, and neither party has identified any other PRP. The Consent Decree requires Hercules to take sole and full responsibility for the implementation of the interim remedy. Specifically, Hercules must create the final plans and specifications for the remedy outlined in the IROD and construct, maintain, and monitor the remedy at an estimated cost of $4.48 million. (Doc. 3-1; doc. 25, p. 9.) Additionally, Hercules bears the full responsibility of supporting community involvement activities; reimbursing the United States for all past response costs in the amount of $153,009.48; and reimbursing the United States for all costs it incurs in connection with the work. (Doc. 25, p. 6.) While the United States will provide Hercules with a covenant not to sue as to the work at OU1, the covenant not to sue does not pertain to the other operable units at the Site or to any final response for OU1. (Id.) Put succinctly, the Consent Decree requires Hercules to bear the full costs of implementing the interim remedy and requires Hercules to reimburse the United States for the entirety of its past and future costs associated with OU1. None of the costs for implementing the interim remedy will be passed on to taxpayers or left for the United States to collect from other PRPs. Therefore, the Court finds that the Consent Decree passes the substantive fairness review.

**B.     Reasonableness**

When assessing the reasonableness of a CERCLA consent decree, Courts look at multiple factors including the decree's "likely efficaciousness as a vehicle for cleansing the environment," "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures," and "the relative strength of the parties' litigating positions." Cannons Eng'g Corp., 899 F.2d at 89–90. The reasonableness inquiry "reflect[s] the Court's 'limited duty' to inquire into the technical aspects of the cleanup program proposed by a consent decree in order to ensure that the proposed settlement adequately addresses environmental and

public health concerns." United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1038 (D. Mass. 1989) (citing United States v. Hooker Chemicals & Plastics Corp., 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982)). Because the selection of a remedy requires "balancing numerous complex technical factors within EPA's expertise," Congress has provided that Court's should not reject the EPA's selection unless it has been "arbitrary and capricious in its selection." Id. (citing 42 U.S.C. § 9613(j)(2)); see also Akzo Coatings of Am., Inc., 949 F.2d at 1426 ("We view the standard of fairness, reasonableness and consistency . . . coupled with the arbitrary and capricious standard of section 9613(j), to be the proper tests for EPA's proposed decree.").

> **1)      The EPA's Determination that the Interim Remedial Action is an Efficacious Vehicle for Cleansing the Environment**

Amici curiae and the public commenters' primary objection to the remedial action proposed in the consent decree is that it will not be as efficacious of a vehicle for cleansing the environment as a total removal of the contaminated soils. (Doc. 34 at p. 8 ("[T]hose [public] comments overwhelmingly expressed a desire for Hercules to remove all contaminated soils from the site, and also specifically requested the use of box culverts at OU1, rather than the open concrete culvert contemplated by Alternative 4 . . . .").) However, the EPA considered the alternative remedial actions preferred by the public when developing the IROD and compared those alternatives to the remedial action the EPA ultimately selected. The EPA's multifactorial analysis included a determination that the selected remedial action would provide adequate protection of human health and the environment. As explained below, the EPA's ultimate selection of the interim remedial action proposed in the Consent Decree was not unreasonable, arbitrary, or capricious.

In developing the IROD, the EPA compared eleven alternatives for remedial action. (Doc. 3-3, pp. 38–53.) The EPA included sediment removal within the existing channel, (id. at pp. 38–

39), and options that employed box culverts, (id. at pp. 45–47), amongst the alternatives it compared. After laying out all alternatives, the EPA then "used a comparative analysis to assess the relative performance of each alternative in relation to nine specific evaluation criteria" which enabled the EPA to "identify the advantages and disadvantages of each alternative relative to the other alternatives." (Id. at p. 53.)

Included in that comparison was a review of each alternative's ability to provide "overall protection of human health and the environment." (Id. at pp. 53–54.) The EPA concluded that each alternative, other than taking no action, "would provide adequate protection of human health and the environment." (Id. at p. 53.) However, pertinently, the IROD identified some shortcomings of the public commenter's preferred remedial action of complete sediment removal referred to in the IROD as "Alternative 2":

> Dredging may leave residual contamination in place and has the potential to release sediment downstream during implementation of the remedial action. The use of dredging would require the construction of a temporary containment berm, site preparation and construction dewatering and drying facilities. Short term and long term bank stability is a concern following disturbance within the Outfall Ditch as the exposed channel banks would be subject to sloughing caused by high flows and tidal influence. While additional dredging would remove contaminated sediments and further reduce contaminant mass, it is possible that complete removal of contaminants is not achievable with this technology and that residual contamination would still be left behind. Due to the lack of toxicity information relating to toxaphene breakdown products an acceptable residual toxaphene concentration in sediments following excavation cannot be determined, making the effectiveness of this remedy uncertain.

(Id. at p. 53.)

In contrast, the IROD described benefits that the selected remedial action of a "concrete-lined channel re-routed with limited sediment removal," referred to in the IROD as "Alternative 4," would bring to the overall protection of human health and the environment. (Id. at pp. 42–43, 53–54.) For example, Alternative 4 "provides additional protection because the newly constructed

conveyance structure is concrete which limits any interaction between groundwater and surface water. Additionally, the open structure provides ease of access for maintenance and removal of accumulated sediment." (Id. at p. 54.) Alternative 4 also scored well when compared to alternatives in the other criteria: compliance with federal and State requirements, standards, criteria, and limitations, (id. at pp. 54–55); long-term effectiveness and permanence, (id. at p. 55); reduction in toxicity, mobility, and volume,[7] (id.); short term effectiveness,[8] (id. at p. 56); implementability,[9] (id); and costs, (id. at pp. 56–57).

Ultimately, the EPA determined that the selected remedial action, Alternative 4, best fulfilled the decision criteria set forth in CERCLA and the NCP. (Id. at pp. 59–60.) The IROD noted and addressed the limitations of this remedial action. For instance, the EPA stated that while the interim remedy is "not intended to be final, [it] provides the best balance of tradeoffs among the other alternatives with respect to pertinent criteria, given the limited scope of action." (Id. at p. 59.) The IROD also noted that, "[b]ecause this remedy will result in hazardous substances remaining on site above health-based levels, a review will be conducted to ensure that the remedy continues to provide adequate protection of human health and the environment within five years

---

[7] The EPA found that the selected remedy, Alternative 4, "reduces or eliminates the mobility of sediments, provides some reduction of volume, and reduces/eliminates the exposure pathways." (Id.) In contrast, the EPA found that Alternative 2, the removal of contaminated sediment, "by removing the ditch sediments offsite to a secure disposal facility, provides for reduction of volume at the site however, does have the potential to mobilize contamination during dredging." (Id. at p. 55.)

[8] The IROD stated that "Alternative 4 of a concrete-lined re-routed ditch provides good short-term effectiveness since work is completed in nonimpacted areas." (Id. at p. 56.) As for the alternative of removing contaminated sediment, the EPA determined "[t]he implementation of dredging in Alternative 2 may result in potential risk of worker physical injury and exposure to impacted material. Excavation and grading work within the existing channel poses a risk for disturbance of and unintended releases of sediments from the area during the work, particularly during storm events or other high water discharge events." (Id.)

[9] The EPA concluded that "Alternatives 1, 3, 4, and 5 are the most implementable with available technologies, materials, and traditional construction equipment where applicable. Alternative 2 requires somewhat specialized equipment and other challenges with water management and waste disposal." (Id.)

after commencement of the remedial action." (Id. at p. 60.)  However, the EPA concluded that the use of containment "to reduce the mobility of sediment contamination from the Outfall Ditch and eliminate exposure to sediment contamination in OU1" was sufficient to address CERLA's statutory mandates.  (Id. at pp. 59–60.)

The amici curiae and some commenters doubt whether the selected remedy of capping the contaminated soils in place will be able to withstand flooding events caused by hurricanes, tidal changes, and global warming.  (Doc. 25-2, pp. 31–32; doc. 34, pp. 11–13, 19.)  However, the record reveals that the EPA considered such concerns in selecting the interim remedy and crafting the Consent Decree.  (See Doc. 25, p. 24; doc. 25-2, pp. 29–31.)  Ultimately, the EPA concluded that multiple measures designed to cap and control the contamination and reduce the potential for the contamination to migrate downstream, as well as regular monitoring required by the IROD, assuaged concerns regarding "rising sea levels, storm surges, and strong hurricanes." (Doc. 25-2, p. 30.)  The EPA explained,

> The selected interim remedy provides a long-term effective remedy with a high degree of permanence and resiliency as required by the Climate Change Adaptation Implementation Plan of 2014.  The Outfall Ditch sediments will be permanently capped/contained, which will reduce long-term exposure to potential receptors and loading of toxaphene-impacted sediments to the Terry and Dupree Creek system. Moreover, the selected interim remedy will reroute the current Outfall Ditch into a new, concrete lined conveyance channel, backfill the current Outfall Ditch, and armor the banks of the former Outfall Ditch near Dupree Creek.  The concrete floor and walls of the channel will consist of durable construction materials and can be readily inspected and maintained/repaired via the open channel design and provide protection against rising sea levels and storm surges.  Further, once the current Outfall Ditch is backfilled, rip rap will be used to armor the banks of the former ditch along Dupree Creek.  This process is referred to as coastal hardening, and is consistent with EPA's Climate Change Adaptation policy.  Additionally, construction of a re-routed channel reduces the risks/concerns of remedy failure in the future (i.e. if the floor or sidewalls of the channel fail; only uncontaminated soil could be eroded into the channel).  The permanence of the interim remedy will be enhanced with the implementation of Land Use Controls.  Operation and maintenance (O&M) of the interim remedy is straight-forward and primarily includes only the periodic removal of accumulated sediments from within the new

outfall channel and inspection and maintenance of the concrete floor and walls. Accumulated sediments can be readily removed with a variety of equipment and techniques through the open channel design as opposed to another alternative in the Feasibility Study, most notably the four-box culvert alternative. Regular inspections and as-needed repairs will ensure that erosion or other issues will be dealt with promptly. Additionally, a long-term monitoring plan will be developed during the OU1 Remedial Design and thereafter implemented and Five-Year Reviews will be conducted to ensure the continued protectiveness of the OU1 interim remedy.

(Id. at pp. 30–31.)

Dr. Terry, EPA's human health risk assessor provides further support for the selection of the interim remedy as an efficacious vehicle for cleansing the environment. In his affidavit, he testifies:

In my professional opinion, the OU1 interim selected remedy is designed to eliminate the movement of contaminated sediments in the Outfall Ditch to Terry and Dupree Creeks and will help to protect human health by eliminating a source of toxaphene in fish. In my professional opinion, eliminating the ditch as a toxaphene source to downstream areas is necessary before performing risk assessments in the creeks to determine what remedial actions may be needed in OU3. Otherwise, it will be difficult to determine the primary sources of toxaphene moving into the creek ecosystem. Long-term monitoring detailed in the Interim Record of Decision for OU1 and additional study of Operable Units 2 and 3 are expected to aid in determining the effectiveness of the selected interim remedy at OU1 and whether additional actions are needed.

(Doc. 25-3, p. 10.)

Once again, the Court must not second guess EPA's technical judgments. Further, it is not the Court's role to determine whether the EPA's selection of the interim remedy is a better plan than the remedy of complete sediment removal preferred by the public commenters. See Cannons Eng'g, 899 F.2d at 84, 88 (characterizing, in a CERCLA action, an argument that the government should have used a different method of determining liability as "a stalking horse" and "second-guessing" and holding that "[h]aving selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods")); City

of Fort Lauderdale, 81 F. Supp. 2d at 1353 ("[I]t is not this Court's role to determine whether [a different method to cap a landfill] is a better protection for the public health than the method chosen by the EPA and the defendants. As stated above, this Court may not substitute its judgment for that of the EPA, the federal government agency with expertise in the area . . . ."). Having reviewed the EPA's reasoning for selecting the interim remedial action and having afforded that reasoning the requisite level of deference, the Court finds that the EPA's selection of the interim remedy as an efficacious vehicle for cleansing the environment was not unreasonable, arbitrary, or capricious.

### 2) Need to Compensate the Public and the Parties' Litigating Position

The Court additionally finds that the need to compensate the public for the costs of the anticipated remedial measures as well as the litigating position of the parties support entry of the Consent Decree. Through this lawsuit, the Court cannot order Defendant to perform any action over and above that requested by the United States in the Complaint. The Consent Decree provides the United States with the entirety of the relief that it sought in its Complaint and requires Hercules to pay the full costs of the interim remedy without the public bearing any of those costs. As the United States points out, "[t]he best-case litigation outcome for the United States would be a judgment holding Hercules liable for performing the interim remedial action and paying the government's response costs. The very same relief is embodied in the [Consent Decree], which achieves the additional significant benefit of allowing the parties to avoid the costs, time demands, and inherent risks of litigation." (Doc. 25, pp. 10–11.)

Again, the Court "cannot tinker with the consent decree, and must either accept or reject the terms." City of Fort Lauderdale, 81 F. Supp. 2d at 1350. If the Court were to reject the Consent Decree's terms, the parties could then proceed to engage in a lengthy and costly litigation that would, at most, hold Defendant liable for the exact same relief that would be ordered in the Consent

Decree. The parties could also appeal a rejection of the Consent Decree. Given the deference afforded to the EPA's selection of a remedial decision, the Eleventh Circuit Court of Appeals would likely overturn the Court's decision and direct the Court to enter the Consent Decree. In such a scenario, the parties would again obtain the exact same result as under the Consent Decree but with months of costly appellate litigation and delay.[10] See id. at 1353 n.9 ("It is clear to this Court that any ruling here that rejected the consent decree would likely result in a reversal of such decision at the appellate level, leading to even more delay in beginning the cleanup of the Wingate Landfill site, thus exposing the public to further threats to the environment from the current status quo situation."). Alternatively, following a rejection, the EPA could start the administrative review process anew. However, there is no assurance that the EPA would come to a different conclusion as to the remedial action, and there is no assurance that Hercules would be required (by consent or otherwise) to perform that remedy or bear any of the United States' costs. Under any of these scenarios (litigation in this Court, appellate litigation, or a new administrative process), rejection would cause the containment and cleanup of contamination at Operable Unit 1 and the remainder of the Site to be mired in delay for years to come with no certainty as to what the remedial action would entail, when the remedial action would begin, and who would bear the remedial costs. Given the decades of delay that the Site has already endured, this would be an exceedingly unfortunate result.[11]

---

[10] In contrast, the EPA estimates that the remedial action can be constructed in twenty-five weeks. (Doc. 3-3, p. 42.) Thus, an appeal of a rejection would likely take nearly as long as construction of the interim remedy.

[11] Dr. Thomas underscores the obvious need for the contamination within OU1 to be addressed promptly. He states that "the toxaphene in the sediments of OU1 are likely serving as a significant contributing source of toxaphene to the ecosystems of Terry Creek and Dupree Creek outside of OU1. It is likely that the longer the OU1 sediments remain unaddressed, the more toxaphene is moving out of the OU1 sediments and into the broader ecosystem of the creeks." (Doc. 25-4, p. 3.)

These practical considerations surrounding the need to compensate the public for the costs of the anticipated remedial measures and the litigating position of the parties further support a finding that the Consent Decree is a reasonable compromise.

### C.  Consistency with the Purposes of CERCLA

The Court's final inquiry is whether the Consent Decree between the United States and Hercules is consistent with CERCLA's purposes.  In conducting this inquiry, Courts typically focus on "two major policies underlying the statute.  First, Congress intended to give the Government the tools to respond promptly and effectively to the problems posed by contaminated hazardous waste sites.  Second, Congress sought to [e]nsure those responsible for the problems resulting from the disposal of hazardous substances bear the costs of remedying the harm they caused."  Bay Area Battery, 895 F. Supp. at 1535 (citing Anspec Co. v. Johnson Controls, Inc., 922 F. 2d 1240, 1241–42 (6th Cir. 1991); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986)).  The parties' proposed Consent Decree furthers both of these goals.

Through the Consent Decree, the EPA achieves a remedy for Operable Unit 1 that it contends will effectively respond to the problems posed by contamination.  As discussed above, amici curiae and the public commenters take issue with how effective the interim remedy will be, but the record is replete with evidence that the EPA has considered those concerns yet still determined that the interim remedy is an efficacious vehicle for addressing risks to human health and the environment.  (See, e.g., doc. 3-3, pp. 53–54, 60–61).  The EPA has determined that "the selected interim remedy will provide protection of human health and the environment by eliminating, reducing, or controlling risks at OU1 through the elimination of pathways that could result in exposure of human or ecological receptors to contaminated sediment and surface water

in the Outfall Ditch." (Id. at p. 61.)  Further, the agency's scientists have determined that the interim remedy for Operable Unit 1 is not only a critical step for addressing pollution within that operable unit but also within the Site as a whole.  (Doc. 25-3, p. 10 (Frederick stating that "eliminating the ditch as a toxaphene source to downstream areas is necessary before performing risk assessments in the creeks to determine what remedial actions may be needed in OU3"); doc. 25-4, p. 4 (Thomas asserting that due to "complexity" of Site, toxaphene contamination is "best addressed by, if possible, eliminating one of the areas a toxaphene source to the creek ecosystem, so that a more accurate cleanup value for toxaphene in the remaining area can be developed").) Moreover, the Consent Decree requires Hercules to perform long-term monitoring, maintenance, and reporting.  (Doc. 3-3, p. 61 ("[T]he use of regular maintenance and monitoring will protect human health and the environment by providing notice if complete exposure pathways are re-established.").  "Such an outcome is wholly consistent with the goals of environmental legislation." Jones Creek Inv'rs, LLC, 2013 WL 164516, at *2.

Additionally, as explained above in the Court's reasonableness inquiry, the interim remedy is consistent with CERCLA's purpose of enabling a prompt response, particularly when compared to the delay that would be caused by protracted litigation.  The IROD estimated twenty-five weeks for construction of the remedial action, (doc. 3-3, p. 42), and under the Consent Decree Hercules will be required to comply with the schedule set forth in the Statement of Work, (doc. 3-4, pp. 19–21).

The Consent Decree also serves CERCLA's intent that Hercules be responsible for the problems resulting from its disposal of hazardous substances and that it, rather than the public, bear the financial burden of remedying the harm it caused.  Hercules is required to bear all of the costs of designing and constructing the interim remedial action, it must reimburse the United States

for past response costs of $153,009.48, it will be subjected to a declaratory judgment that it is liable for future response costs, and it will be responsible for maintenance, monitoring, and reporting regarding the remedial action. (Doc. 3-1.) While the United States will provide Hercules with a covenant not to sue as to the work at Operable Unit 1 as well as protection against third-party claims for contribution, the covenant not to sue does not pertain to the other Operable Units or to any final response for Operable Unit 1. (Id.) On this front, some of the public comments took issue with the fact that the Consent Decree does not include an admission of liability by Hercules. However, in CERCLA, Congress specifically gave the EPA the authority to "fashion a consent decree so that the entering of such decree and compliance with such decree . . . shall not be considered an admission of liability for any purpose." 42 U.S.C. § 9622(d)(1)(C) (emphasis added). Further, courts have repeatedly recognized that consent decrees typically do not contain an admission of liability because requiring such a provision would likely thwart any efforts at compromise. See Maher v. Gagne, 448 U.S. 122, 126 n.8 (1980) (noting that, "as is customary," consent decree did not purport to adjudicate claims and decree explicitly stated that it was not intended to constitute an admission of liability); U.S. S.E.C. v. Citigroup Glob. Mkts. Inc., 673 F.3d 158, 165 (2d Cir. 2012) (criticizing "district court's apparent view that the public interest is disserved by an agency settlement that does not require the defendant's admission of liability," and adding that "[r]equiring such an admission would in most cases undermine any chance for compromise").

For all of these reasons, the Court finds that the Consent Decree is consistent with the purposes of CERCLA.

## CONCLUSION

The Court once again emphasizes the boundaries it must remain within when reviewing the parties' proposed Consent Decree. It would be improper for the Court to substitute its judgment for the EPA's technical judgments underlying the Consent Decree. Moreover, the Court must not modify the parties' agreement or attempt to draft a better plan. Indeed, the Court's focus is not whether the parties' resolution is the best alternative for addressing the contamination or the resolution that the Court would have preferred. Rather, the Court must limit its inquiry to ensuring that the Consent Decree is not unlawful, unreasonable or inequitable. For the reasons laid out above, the Court finds that the Consent decree satisfies that review. Therefore, the Court **GRANTS** the Motion to Enter Consent Decree, (doc. 25). The Court will enter the decree on the docket contemporaneously with this Order. The Court **DIRECTS** the Clerk of Court to **CLOSE** this case.

**SO ORDERED**, this 27th day of November, 2019.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA